[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-342

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

BENNETT ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

OHIO ORGANIZING COLLABORATIVE ET AL. *v*. OHIO REDISTRICTING COMMISSION ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Slip Opinion No. 2022-Ohio-342.]

*Redistricting—Original actions under Ohio Constitution, Article XI—The Ohio Redistricting Commission's revised plan violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution—Revised plan is invalid—The Ohio Redistricting Commission shall be reconstituted, convene, and adopt an entirely new plan in conformity with the Ohio Constitution.*

(Nos. 2021-1193, 2021-1198, and 2021-1210—Submitted February 1, 2022— Decided February 7, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XI, Section 9.

**Per Curiam.**

## I. INTRODUCTION

{¶ 1} On January 12, 2022, this court held that the General Assembly–district plan adopted by respondent Ohio Redistricting Commission in September 2021 was invalid. *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 2, 138. We held that petitioners[1] had proved beyond a reasonable doubt that the commission had not attempted to draw a district plan that met the standard in Article XI, Section 6(A) of the Ohio Constitution—which requires that no plan be drawn primarily to favor a political party—or the proportionality standard in Article XI, Section 6(B)—which requires that the statewide proportion of districts whose voters favor each political party correspond closely to the statewide preferences of the voters of Ohio. *Id*. at ¶ 2, 114, 131, 138. We ordered the commission to be reconstituted and to adopt a new plan in conformity with the standards set forth in Sections 6(A) and 6(B) within ten days of our judgment. *Id*. at ¶ 137-139. We retained jurisdiction for the purpose of reviewing the new plan and authorized petitioners to file objections to the new plan within three days of the plan's adoption. *Id*. at ¶ 139.

{¶ 2} The commission adopted a plan on January 22. Petitioners timely objected, arguing that the plan does not meet the standards set forth in Sections 6(A) and 6(B). Some of the petitioners also argue that the plan improperly splits municipalities and townships in violation of Article XI, Section 3(D)(3) and that

---

1. Petitioners in case No. 2021-1193 are the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and six individual voters: Tom Harry, Tracy Beavers, Valerie Lee, Iris Meltzer, Sherry Rose, and Bonnie Bishop. Petitioners in case No. 2021-1198 are ten individual voters: Bria Bennett, Regina C. Adams, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Meryl Neiman, Holly Oyster, Constance Rubin, and Everett Totty. Petitioners in case No. 2021-1210 are the Ohio Organizing Collaborative, the Ohio chapter of the Council on American-Islamic Relations, the Ohio Environmental Council, and six individual voters: Pierrette Talley, Samuel Gresham Jr., Ahmad Aboukar, Mikayla Lee, Prentiss Haney, and Crystal Bryant.

the commission violated certain procedural requirements in Article XI, Section 1(C). The commission timely responded to the objections.

{¶ 3} We hold that petitioners have shown beyond a reasonable doubt that the plan adopted by the commission on January 22 violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. We do not reach the alleged violations of Article XI, Section 1(C) and Section 3(D)(3). As explained in more detail below, we again order the commission to be reconstituted and to adopt a new plan in conformity with the Ohio Constitution.

## II. BACKGROUND

### A. The commission reconvenes

{¶ 4} On January 16, 2022—four days after we issued our decision invalidating the original district plan—the commission announced that it would reconvene on January 18. The commission's announcement stated that individual commission members were instructing their respective staff members to "begin identifying possible areas to address the court's ruling regarding Section 6 of the Ohio Constitution" and that commission members would "have access to other commission members' relevant staff and contractors."

{¶ 5} On January 17, Ray DiRossi and Blake Springhetti, who worked for the Senate and House Republican Caucuses, respectively, and who were the map drawers for the commission's original district plan, met with staffers for the Senate and House Democratic Caucuses and Chris Glassburn, a consultant retained by the Democratic legislative caucuses for map-drawing purposes. Among other things, they all seem to have agreed that they would use election data from all statewide federal and state partisan elections from 2016 to 2020.[2]

---

2. Article XI, Section 6(B)'s proportionality standard refers to "statewide state and federal partisan general election results during the last ten years." Ohio Constitution, Article XI, Section 6(B); *see also League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 105. In their objections, petitioners have not contested the commission's use of statewide election results from 2016 to 2020 rather than from the entire ten-year period.

{¶ 6} During the January 18 commission meeting, Governor Mike DeWine administered the oath of office to a new commission member, House Minority Leader Allison Russo, who replaced Representative Emilia Sykes.[3] Some of the commission members expressed their understanding of the commission's task in light of this court's ruling. Yet the commission members did not engage in any map drawing or otherwise specifically explain how they intended to redraw the district plan.

{¶ 7} After the meeting, staff representatives of each commission member met and agreed to continue meeting in the days ahead. At some point, the commission members decided to take a "regional" approach to the map-drawing process. On January 19, DiRossi and Springhetti began emailing other staff representatives possible changes to House and Senate districts in different regions of the state, requesting feedback. DiRossi and Springhetti started with proposed changes in Franklin and Hamilton Counties and later sent a proposal regarding Lorain County. On January 20, Glassburn replied with the "[D]emocratic responses" to the proposals for Franklin and Hamilton Counties.

**B. The commission's January 20 meeting**

{¶ 8} The commission met again on January 20. Speaker of the House Robert Cupp, who cochaired the commission with Senator Vernon Sykes, said that staff for each of the commission members—both the legislative members and the statewide-officeholder members—had been working together but that the commission had not yet reached an agreement. House Speaker Cupp further said that "[w]e"—presumably referring to himself and President of the Senate Matthew Huffman or to Republican members of the commission—had proposals for Franklin and Hamilton Counties and their surrounding areas, which had been posted to the commission's website. In an affidavit submitted to this court, Senator

---

3. On January 12, the House Democratic Caucus elected Russo as the House Minority Leader, and on January 26, she was sworn into that office.

Sykes stated that he was "caught off guard" by that statement because he did not know that the Republican commission members would be submitting their own county maps on the commission's website before the commission had reached a consensus on how those districts would be drawn. Senator Sykes requested a recess.

{¶ 9} House Speaker Cupp's proposal included a map of the areas in and around Franklin and Hamilton Counties, the boundaries of the proposed districts in those areas, and the "index"—i.e., the partisan leaning—for each district. For example, under his proposal, Franklin and Union Counties would include 11 Democratic-leaning House districts, 1 Republican-leaning House district, 4 Democratic-leaning Senate districts, and 0 Republican-leaning Senate districts— which was one fewer Republican-leaning House district and one fewer Republican-leaning Senate district than in the same territory under the commission's original district plan. But some of the Democratic-leaning districts favored Democratic candidates by very slim margins, including a Senate district with a 50.08 Democratic index and a House district with a 50.14 Democratic index. House Speaker Cupp's proposal for Hamilton and Warren Counties included one fewer Republican-leaning House district than in the commission's original district plan. But again, one House district had a 50.14 Democratic index.

{¶ 10} After the recess, House Speaker Cupp gave a brief presentation of his proposal. He said that the maps were drawn to keep the districts compact and competitive and "to take a step towards the proportionality requirement of the Constitution, as explained by the Ohio Supreme Court." Senator Sykes introduced Glassburn to present a "counter" on behalf of the Democratic members of the commission. Glassburn distributed his own maps for Franklin and Hamilton Counties—which by that point had also been posted on the commission's website—and explained the similarities with and differences from the "Republicans' proposal." Significantly, he noted that in the Democratic proposal,

5

both Senate districts within Hamilton County leaned Democratic, while the Republican proposal included only one Democratic-leaning Senate district. Senator Sykes repeatedly said that reconfiguring those Hamilton County Senate districts would be a simple way for the commission to move toward proportionality. Glassburn also cautioned that if one political party had a disproportionate number of districts in which the party was favored by just over 50 percent, the "court's concerns regarding the asymmetry of districts * * * will come into play."

{¶ 11} In response to a question from Auditor of State Keith Faber, Glassburn said it was "more than possible" to comply with Article XI, Sections 2, 3, 4, 5, and 7 of the Ohio Constitution, to draw compact districts, and to "meet the ratio established by the court" under Section 6(B).[4]  Auditor Faber noted that in *League of Women Voters of Ohio*, *see* __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 112, we had cited a proposed plan submitted by one of petitioners' experts, Dr. Jonathan Rodden, that purportedly complied with all of Article XI's requirements and was more proportional to statewide voter preferences than the plan originally adopted by the commission.  But that plan, Auditor Faber said, "was not a 54 or 55 map" but a "57 or 58 map."

{¶ 12} After questioning Glassburn, Senator Sykes said that instead of adjourning, the commission would recess "because our time is short and we want to make sure we provide adequate notice."  The commission therefore recessed until 9:30 a.m. the following day, Friday, January 21.  The commission, however, did not meet on January 21.

---

4. In *League of Women Voters of Ohio*, we found that votes cast in statewide elections over the relevant period showed that "about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates.  Accordingly, under Section 6(B), the commission is required to attempt to draw a plan in which the statewide proportion of Republican-leaning districts to Democratic-leaning districts closely corresponds to those percentages." __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 108.

{¶ 13} Throughout the January 20 meeting, commission members noted that their staffs had been working together to comply with this court's order. Senator Sykes stated: "This is the first time I believe in the history of the state that Republican and Democrat staff have been working together on maps. It's a herculean task, but I think we're up to trying to make sure we comply with the court order * * *." But Senator Sykes's optimism did not last long. In affidavits filed in this litigation, he and House Minority Leader Russo averred that the Republican commission members and/or their staffs ultimately would not commit to the goal of drawing a proportional plan and refused to collaborate with them or consider their suggestions to make the plan more proportional.

## C. Petitioners submit a proposed plan and the commission releases more regional maps

{¶ 14} On January 20, counsel for the petitioners in *Bennett v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1198) submitted to the commission a revised version of a proposed General Assembly–district plan drafted by Dr. Rodden (the "Rodden II plan").[5]

{¶ 15} On January 21, the commission posted a proposal for Lorain County to its website. In comparison to the commission's original plan, the proposal changed one Republican-leaning House district and one Republican-leaning Senate district to Democratic-leaning districts. The proposal included a House district with

---

5. In October 2021, the *Bennett* petitioners submitted an expert report from Dr. Rodden in which he claimed that he had drafted a district plan that complied with Article XI's line-drawing requirements and was more proportional than the commission's original plan. In their merit briefs, respondents did not contest Dr. Rodden's assertion, and in *League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 126, we noted that Dr. Rodden's district plan "complied with Article XI" and resulted in a partisan split favoring Republican candidates by 57 percent to 43 percent in the House and 55 percent to 45 percent in the Senate. Dr. Rodden, however, later discovered that his plan included splits that are impermissible under Article XI, Section 3 of the Ohio Constitution, and he therefore submitted a revised version during the commission's redrawing process.

a Democratic index of only 50.003 and a Senate district with a Democratic index of 50.030.

{¶ 16} Also on January 21, DiRossi sent to staff representatives a proposal for changes to Cuyahoga and Summit Counties and again asked for feedback. That proposal was posted to the commission's website on January 22. Compared to the commission's original plan, the proposal changed two Republican-leaning House districts and one Republican-leaning Senate district to Democratic-leaning districts. Under this proposal, six of the region's Democratic-leaning House districts had indexes between 50 and 51 percent.

{¶ 17} Early on January 22—the tenth day after this court's decision invalidating the original plan—DiRossi and Glassburn each distributed their final proposed General Assembly–district plans to staff representatives for the commission members.

### D. The commission adopts a district plan on January 22

{¶ 18} In the afternoon of January 22, the commission resumed the meeting it had commenced on January 20. House Speaker Cupp said that he and Senator Sykes had agreed that the respective map drawers for the "Republicans" and the "Democrats" would each present their proposed district plans to the commission and that the commission members could discuss the proposals after the presentations.

{¶ 19} During DiRossi and Springhetti's presentation, Springhetti noted that they had been instructed to use the "base map"—i.e., the plan that we had invalidated in *League of Women Voters of Ohio*—as a "starting point" because it was familiar to them and complied with Article XI, Sections 2, 3, 4, 5, and 7. DiRossi said that he had been "actively engaged daily and around the clock with the staff of all seven members of the Commission," and he explained how DiRossi and Springhetti had incrementally proposed changes regarding urban areas of the state to comply with this court's order. In total, they had changed five House districts in the commission's

8

original plan from Republican-leaning to Democratic-leaning and had changed three Senate districts from Republican-leaning to Democratic-leaning. Their proposal had 57 Republican-leaning and 42 Democratic-leaning House districts and 20 Republican-leaning and 13 Democratic-leaning Senate districts. DiRossi said that they could not devise a plan containing fewer than 57 Republican-leaning House districts without otherwise violating another section of Article XI.

{¶ 20} House Minority Leader Russo noted that under DiRossi and Springhetti's proposal, 14 of the 42 Democratic-leaning House districts had a Democratic index between 50 and 52 percent but none of the Republican-leaning House districts had an index between 50 and 52 percent. That result, she noted, appeared to evince "an intentional approach to drive as many of those close to 50 to technically say that you have created a Democratic leaning district without actually in good faith creating as many Democratic leaning districts that are possible" under the Constitution's proportionality standard. In response to those comments, DiRossi explained the process for changing a district from Republican-leaning to Democratic-leaning and noted, "[W]hether we ended at 49.2, or 49.8, or 49.9, or 48.2, when you finally get over the hurdle to go under 50, and everything else balances, and everything else matches, I would move on to another district."

{¶ 21} Senator Sykes repeatedly asked DiRossi and Springhetti to identify what prevented them from achieving a more proportional plan and from changing the Senate pairings in Hamilton County to create another Democratic-leaning Senate district in that county—as he had previously recommended. In varying ways, DiRossi and Springhetti responded that they had attempted to comply with this court's order and that any alternative proposals coming closer to providing perfect proportionality contained constitutional defects. But they did not specifically explain what prevented them from reconfiguring the Hamilton County Senate districts. When Senator Sykes pressed DiRossi and Springhetti about the

Hamilton County districts, House Speaker Cupp cut off the questioning and said that DiRossi and Springhetti had responded in the best way they could.

{¶ 22} Glassburn claimed during his presentation that his proposal met the proportionality standard in Article XI, Section 6(B) and that it complied with Article XI's other requirements. Senate President Huffman, however, identified what he considered to be constitutional defects in Glassburn's plan, including possible violations of Article XI, Section 3(D)(3), Section 5, and Section 6(C).

{¶ 23} Auditor Faber expressed concerns about not having received a proposal from the Democratic members until the day of the commission's deadline and said, "It appeared to many of us that because we wouldn't say that we absolutely were going to do a 45-54 map, that somebody took their ball and went home." Auditor Faber also expressed concerns about intentionally placing Republican voters in Democratic-leaning districts to "hit some superficial ratio." In his words, Glassburn's proposal was "effectively taking districts and gerrymandering them to hit some Democratic ratio." Later in the meeting, Auditor Faber explained why he believed "this arbitrary percentage * * * is a little bit suspect." And he again noted that Dr. Rodden had had 57 Republican-leaning House districts in his original plan and that we had cited that plan in *League of Women Voters of Ohio*; therefore, according to Auditor Faber, this court had already indicated that a plan with 57 Republican-leaning House districts would be constitutional.[6]

{¶ 24} After the commission members had finished questioning Glassburn, Senator Sykes said that it was never his or House Minority Leader Russo's "intention to produce a map because we were directed by the court for the

---

6. In actuality, we cited the Rodden plan as an example of a plan that met Article XI's line-drawing requirements and was more proportional than the original plan; we did not state that a plan potentially providing any specific number of House seats for a particular political party would pass constitutional muster. *League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 126, 130-131.

commission to produce a map, not to have the Democratic map and a Republican map." He had recommended the "regional" approach to the map-drawing process, he said, because the commission members could not initially agree on which plan to use as a starting point. He also said that he had been informed only a day or two before the January 22 meeting that other commission members or their staff believed that Article XI, Section 6(B)'s proportionality requirement could not be met. Therefore, he—and presumably House Minority Leader Russo—had asked Glassburn to put together a district plan to show that by employing a different strategy, the commission could adopt a map that meets Section 6(B)'s proportionality standard.

{¶ 25} After a recess, the commission voted five to two, along party lines, to adopt DiRossi and Springhetti's proposal as the final General Assembly–district plan. Because the majority vote adopting the plan did not have the level of bipartisan support required by Article XI, Section 8(B) of the Ohio Constitution for the plan to remain in effect for ten years, the plan can remain in effect for no more than four years. Ohio Constitution, Article XI, Section 8(C)(1)(a).

{¶ 26} The Article XI, Section 8(C)(2) statement adopted by the five commission members who voted for the revised plan said that neither the Ohio Constitution nor this court's decision in *League of Women Voters of Ohio* required the commission to adopt a plan that achieves strict proportionality.[7] The statement indicated that the commission was required to attempt to draw a plan that closely corresponds to statewide voter preferences and that the commission had met that standard. The statement also indicated that the revised plan was the only submitted

---

7. As noted in *League of Women Voters of Ohio*, if the commission adopts a four-year plan, the plan must include a statement explaining how the commission complied with Article XI, Section 6(B)—that is, explaining what the commission determined to be the statewide preferences of Ohio voters and how the commission's plan corresponds to those preferences. __ Ohio St.3d __, 2022-Ohio-62, __ N.E.3d __, at ¶ 8, 25.

plan that fully complied with Article XI, Sections 2, 3, 4, 5, and 7 and with all subsections of Section 6.

{¶ 27} Senator Sykes and House Minority Leader Russo submitted a separate statement. Among other things, they indicated that the commission had failed to comply with Section 6 as interpreted by this court and that it is not impossible to draw a proportional map that is compliant with the Constitution's line-drawing requirements. They also cited Republican commission members' failures to properly instruct their staff to comply with the proportionality requirement, and they stated that the Republican members did not consider proposed maps submitted by the public and rejected their offers to work together on the plan. They stated, "It is possible to meet the Court's order; it just appears that the majority of Commissioners do not want to."

### E. Petitioners file objections

{¶ 28} On January 25, petitioners filed objections to the commission's revised plan. The petitioners in all three cases argue that the revised plan violates Article XI, Sections 6(A) and 6(B). The *Bennett* petitioners argue that the revised plan also violates Article XI, Section 1(C) and Section 3(D)(3). With their objections, petitioners have collectively submitted five new expert reports. On January 28, the commission filed a response to the objections, which included a new affidavit from DiRossi. Senator Sykes and House Minority Leader Russo filed a separate pro se response to the objections, which included affidavits from Senator Sykes, House Minority Leader Russo, and Glassburn.

### III. ANALYSIS

### A. The burden and standard of proof

{¶ 29} As we explained in *League of Women Voters of Ohio*, we have generally treated apportionment plans as presumptively constitutional. __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 76. Petitioners therefore have the burden of proving that the revised plan violates the Constitution. *Id*. at ¶ 76-77.

They must prove factual issues beyond a reasonable doubt. *Id.* Yet, the presumption and high burden of proof do not require us to defer to the commission's interpretation of Article XI.

## B. Article XI, Section 6(A)

### 1. Our prior decision

{¶ 30} Article XI, Section 6(A) of the Ohio Constitution provides that the commission must attempt to meet the standard that "[n]o general assembly district plan shall be drawn primarily to favor or disfavor a political party." Thus, Section 6(A) "requires this court to discern the map drawers' intent." *League of Women Voters of Ohio* at ¶ 116. In our prior decision, we recognized that "direct or circumstantial evidence may establish that a districting plan was drawn primarily to favor one political party over another." *Id.* at ¶ 117.

{¶ 31} "A map-drawing process may support an inference of predominant partisan intent." *Id.* at ¶ 118. In finding that the predominant intent in drafting the original plan was to favor Republicans, we noted that Senate President Huffman and House Speaker Cupp had "controlled the process of drawing the maps that the commission ultimately adopted." *Id.* We observed that "[w]hen a single party exclusively controls the redistricting process, 'it should not be difficult to prove that the likely political consequences of the reapportionment were intended.' " *Id.* at ¶ 120, quoting *Davis v. Bandemer*, 478 U.S. 109, 129, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (plurality opinion), *abrogated on other grounds by Rucho v. Common Cause*, __ U.S. __, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019).

{¶ 32} We also examined expert evidence—including reports from Dr. Michael Latner, Dr. Kosuke Imai, and Dr. Rodden—to determine whether the original plan's partisan skew could be "explained solely by nondiscriminatory factors." *Id.*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 121. Dr. Latner opined that the original plan displayed partisan asymmetry caused by deliberate choices to create safe seats for Republican candidates. *Id.* at ¶ 122-123. Dr. Imai

concluded that the original plan was more favorable to Republicans than any of his 5,000 simulated plans. *Id.* at ¶ 124. And Dr. Rodden purported to have drawn an Article XI–compliant plan that favored the Republican Party in 57 percent of House districts and 55 percent of Senate districts.[8] *Id.* at ¶ 126.

{¶ 33} Based on this evidence, we held that the extreme partisan skew of the original plan was not due to Ohio's political geography but, rather, to the commission's carrying out its intent to favor the Republican Party at the expense of the Democratic Party. *Id.* at ¶ 131.

### 2. *The commission violated Section 6(A)*

{¶ 34} Article XI, Section 1 of the Ohio Constitution requires the "commission" to draft a district plan. Although the Republican and Democratic commission members were somewhat more cooperative in the development of the revised plan, as noted above, Senator Sykes's optimism about collaboration proved short-lived. DiRossi and Springhetti still ultimately drafted the plan, and they answered only to Senate President Huffman and House Speaker Cupp. As before, "the commission itself did not engage in any map drawing or hire independent staff to do so," *League of Women Voters of Ohio* at ¶ 119.

{¶ 35} Moreover, in *League of Women Voters of Ohio*, we noted the distinction between Section 9(B), which "contemplates that this court may declare a plan invalid and order the commission to adopt an *entirely new plan*," and Section 9(D)(3), under which this court does "not have to declare a plan entirely invalid if violations of Section 2, 3, 4, 5 or 7 are isolated or would require *amendments regarding relatively few districts*." (Emphasis added.) __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 96. We made clear that we were invalidating the original plan, in its entirety, under Section 9(B).

---

8. After this court's judgment, petitioners acknowledged that the plan Dr. Rodden previously submitted did *not* comply with all of Article XI's requirements. Dr. Rodden submitted the Rodden II plan, in which he purported to correct the violations.

{¶ 36} Yet the commission did not adopt an entirely new plan. DiRossi and Springhetti started with the same plan that we invalidated and then merely adjusted certain districts just enough so that they could nominally be reclassified as "Democratic-leaning." As DiRossi testified before the commission, when he finally got "over the hurdle to go under 50 [percent of Republican vote share in a district]," he "would move on to another district." At the same hearing, DiRossi was asked why the plan contained many districts with a Democratic vote share between 50 and 52 percent but contained zero districts with a Republican vote share of less than 52 percent. The questioner asserted, "So effectively, you know, you are creating districts with less opportunity for clearly perhaps Democrats to sit into those seats," and then she asked why those decisions had been made. DiRossi responded:

> [I]f you're asking if we were identifying collectively as a staff a district that might favor Republican by 53 percent and trying to make it a Democrat-leaning seat, yes is moving to the other side of the ledger, so I think that's why there is an absence of those seats on the Republican side because they were identified by the staff, they were—they were modified to make Democrat-leaning and so that's why they're not there anymore.

{¶ 37} It is clear that the map drawers and the commission knew that their approach—starting with the invalidated map and switching competitive Republican-leaning districts to competitive Democratic-leaning districts—would have the dual effect of eliminating weak Republican districts and creating weak Democratic districts. The commission nevertheless adopted the revised map using that process—on a party-line vote. This was not the process that our decision contemplates, and the commission's awareness of the partisan effects supports an

"inference of predominant partisan intent" similar to the one we found with respect to the original plan, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 118.

{¶ 38} We find unavailing the claim that the map makers started with the original plan because time was short and they were familiar with it. We clearly invalidated the entire original plan in *League of Women Voters of Ohio*. The commission's choice to nevertheless start with that plan and change it as little as possible is tantamount to an intent to preserve as much partisan favoritism as could be salvaged from the invalidated plan.

{¶ 39} It is also clear that the commission rejected, without explanation, easy and obvious changes that would have made the revised map more proportional. Senator Sykes proposed to swap the Senate districts to which House districts 26 and 30—both in Hamilton County—are assigned, which would have created an additional Democratic-leaning Senate district. This simple swap would have posed no other constitutional problems and would have resulted in Senate districts that are at least as compact as those in the revised plan. Yet the commission refused to adopt the change, with House Speaker Cupp abruptly and inexplicably cutting off Senator Sykes's questioning of DiRossi and Springhetti about the proposal. The commission's choice to avoid a more proportional plan for no explicable reason points unavoidably toward an intent to favor the Republican Party. In reaching this conclusion, we are not unmindful of the fact that 20 is the number of senators necessary to constitute a veto-proof supermajority in the Senate, *see* Ohio Constitution, Article II, Section 16 (a vote of 60 percent of the members of each chamber is required to override the governor's veto).

{¶ 40} Article XI, Section 6(B) provides that the commission shall attempt to draft a plan in which "[t]he statewide proportion of *districts whose voters * * * favor* each political party shall correspond closely to the statewide preferences of the voters of Ohio." (Emphasis added.) Yet the commission knowingly adopted a plan in which all the House districts whose voters favor Republicans do so at vote

shares of 52.6 percent and above, while more than a quarter (12 out of 42) of the House districts whose voters "favor" Democrats do so at a vote share between 50 and 51 percent (meaning that a 1 percent swell in Republican vote share would sweep 12 additional districts into the Republican column). Nine of those districts favor Democrats at a level under 50.5 percent. While the Constitution does not require exact parity in terms of the vote share of each district, the commission's adoption of a plan in which the *quality* of partisan favoritism is monolithically disparate is further evidence of a Section 6(A) violation. In other words, in a plan in which every toss-up district is a "Democratic district," the commission has not applied the term "favor" as used in Section 6(B) equally to the two parties. The commission's adoption of a plan that absurdly labels what are by any definition "competitive" or "toss-up" districts as "Democratic-leaning"—at least when the plan contains no proportional share of similar "Republican-leaning" districts—is demonstrative of an intent to favor the Republican Party. Indeed, if a Republican candidate were to win in half of the 12 House districts in which the Democratic vote share is between 50 and 51 percent, the Republican Party could expect to have a 63 to 36 majority in the House. This is an even larger Republican majority than the one contemplated in the September 2021 plan that we invalidated. *See League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __ at ¶ 24 (noting that Senate President Huffman estimated that 62 seats in the House would favor Republican candidates). Regardless, the revised plan's structure guarantees that the 58 percent seat share for Republicans is a *floor* whereas the 42 percent seat share for Democrats is a *ceiling*.

{¶ 41} In *League of Women Voters of Ohio*, we also relied on statistical evidence—including a partisan-symmetry analysis and a determination that the original plan was a partisan outlier compared to Dr. Imai's 5,000 simulated plans—to support our finding of a violation of Article XI, Section 6(A). *Id.* at ¶ 122-126. As support for that finding of primarily partisan intent, we also cited evidence that

the original plan had a heavier partisan skew than would be dictated merely by Ohio's political geography and the neutral map-drawing requirements of Article XI, Sections 3 and 4. *Id*. at ¶ 131.

{¶ 42} As in the original plan that this court invalidated, there is evidence that the revised plan has a high degree of partisan asymmetry: Dr. Latner's analysis indicates that with 50 percent of the statewide vote, Democrats would expect to win 43 percent of the House seats and 42 percent of the Senate seats. By contrast, the Republicans would win 57 percent of the House seats and 58 percent of the Senate seats with the same percentage of the statewide vote. Dr. Latner concludes that "the asymmetry in both the revised House and Senate maps is only a marginal improvement from the Original Plan and lags far behind all other comparison plans." He further opined that "the Commission intentionally created a large number of highly competitive but Democratic-leaning districts, while keeping more Republican voters in safer districts. That decision is a major source of the observed asymmetry."

{¶ 43} There is also evidence that the revised plan is a statistical outlier in terms of Republican seat share (more than five standard deviations greater) and in terms of various accepted metrics in political science for measuring partisan bias (ranging between six and nine standard deviations), as compared with Dr. Imai's 5,000 simulated plans. As we said in *League of Women Voters of Ohio*, "[t]he fact that the adopted plan is an outlier among 5,000 simulated plans is strong evidence that the plan's result was by design." __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 124. We again find petitioners' statistical evidence to be compelling.

{¶ 44} As in the original plan that this court invalidated, there is also evidence that it was possible for the commission—had it committed to attempting a proportional map, worked collaboratively toward that end, and used its allotted time efficiently—to draw a map that achieved or closely achieved the 54 to 46 percent partisan share that we identified in *League of Women Voters of Ohio*. The

record indicates that the commission did not reconvene until January 18—six days after our ruling ordering the commission to draft a new plan within ten days—and did not hold a substantive meeting until January 20, forcing the process to be rushed. While DiRossi and Springhetti, who worked for Republican commission members, and Glassburn, who worked for Democratic commission members, nominally met with commission members and their staffs, DiRossi and Springhetti still prepared a statewide map about which Senator Sykes was "in the dark," about which House Minority Leader Russo had "little clue," and that was introduced and later adopted on the same day.

{¶ 45} In *League of Women Voters of Ohio*, we further found the existence of an alternative, more proportional plan to be probative evidence that the commission had drawn the original plan primarily to favor the Republican Party. *Id.* at ¶ 126. Petitioners focus on the Rodden II plan, which they claim is less skewed than the revised plan. The commission asserts that the Rodden II plan contains violations of Article XI, Section 3(D)(3) that "affect thousands of people and would require substantial redrawing." The commission, however, relies on DiRossi's opinion, which at this point we do not view as an objective measure of the validity or constitutionality of the various plans.

{¶ 46} Regardless, Glassburn has also prepared a map that he avers is both proportional and otherwise constitutional. Glassburn submitted an initial version of his map to the commission on its final day. Commission members identified potential constitutional violations in that map, which Glassburn avers he could have addressed if given several hours. The commission did not permit him to do so. The commission also rejected his offers to work to add additional Democratic seats to the revised plan, citing time pressure (which, of course, the commission itself had created). Glassburn avers that he later corrected the errors in his map and that he now has a map that addresses the issues the commission raised with his original

map and is proportional, containing 54 Republican House seats, 45 Democratic House seats, 18 Republican Senate seats, and 15 Democratic Senate seats.

{¶ 47} Despite its unwillingness to work toward fixing Glassburn's more proportional plan, the commission concedes that its revised plan also contains "a few minor violations of Section 3(D)(3)." We find the evidence regarding alternative plans to be just as persuasive here as the original Rodden plan was in *League of Women Voters of Ohio*.

{¶ 48} The decennial reapportionment of seats in the General Assembly is a weighty and important task, which the people of Ohio, by their overwhelming approval in 2015 of amendments to Article XI of the Ohio Constitution, entrusted to a special body of limited duration and singular purpose: the Ohio Redistricting Commission. *See* Article XI, Section 1(A). The commission is composed, in part, of three of the state's highest executive officeholders. *Id*. Their duties as commission members, however, do not overlap with their roles as governor, secretary of state, or auditor. *Id*.; *see generally* Article XI. Rather, the Constitution taps these high officeholders to help usher Ohio through its redistricting because they can be counted on as reliable stewards of the public trust. The commission's remaining members are persons appointed by the Speaker of the House of Representatives, the House Minority Leader, the President of the Senate, and the Senate Minority Leader. Article XI, Section 1(A). The Constitution does not require these officeholders to appoint *themselves* to the commission—although that is what most of them have chosen to do in this case. In fact, it does not require the persons they appoint to be members of the legislature. *Id*. But whichever persons are appointed, the commission members are all public servants, regardless of their roles outside the commission, and they are entrusted with the solemn duty to draw a district plan that complies with the requirements of Article XI. They are charged with drawing a plan that inures to the benefit of not just one political party, not just one constituency, but of Ohio as a whole. Members of the legislature selected to

serve on the commission must be, in good faith, *commission members* first, setting aside their usual partisan modes. Section 6(A) directly prohibits actions in conflict with this principle.

{¶ 49} We hold that the evidence discussed above demonstrates beyond a reasonable doubt that in drawing the revised plan, the commission failed to comply with Article XI, Section 6(A) of the Ohio Constitution. As explained in more detail below, we invalidate the entire revised plan and order the commission to draft an entirely new plan—this time in accordance with all of Article XI, including Section 6(A), as explained above.

### C. Article XI, Section 6(B)

*1. Our prior decision*

{¶ 50} Article XI, Section 6(B) of the Ohio Constitution provides that the commission shall "attempt" to draw a district plan that meets the following standard: "The statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." In *League of Women Voters of Ohio*, we explained that the qualifying word "attempt" does not mean that the Section 6(B) standard is merely aspirational. *League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 90. Indeed, "there might be circumstances that make it impossible for the commission to meet the standards of Section 6 while also following the map-drawing requirements of Sections 2, 3, 4, 5, and 7." *Id*. at ¶ 88. But "[i]f it is possible for a district plan to comply with Section 6 *and* Sections 2, 3, 4, 5, and 7, the commission must adopt a plan that does so." (Emphasis sic and footnote omitted.) *Id*.

{¶ 51} As we explained in *League of Women Voters of Ohio*, Article XI, Section 6(B) "requires the calculation—and then the comparison—of two things." *Id*. at ¶ 105. The commission first must calculate "the statewide proportion of

districts whose voters favor each political party," which requires the commission to "examin[e] the statewide federal and state partisan election results from the previous ten years" to "determine how voters in the proposed districts are likely to vote in future elections." *Id.* It then must calculate "the statewide preferences of the voters of Ohio," *id.* at ¶ 106, which requires the commission to total "the votes cast in statewide partisan elections and [calculate] the percentages of votes received by candidates of each political party," *id.* at ¶ 107. Under this methodology, there is no dispute that "about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates" in the relevant past elections. *Id.* at ¶ 108.

{¶ 52} We concluded that Senate President Huffman and House Speaker Cupp never instructed the map drawers, DiRossi and Springhetti, to attempt to comply with Article XI, Section 6. *Id.* at ¶ 109. We also determined that Senate President Huffman and House Speaker Cupp—as reflected in the commission's statement explaining its determinations pursuant to Section 8(C)(2)—had an incorrect understanding of the proper methodology, because they asserted that the share of Ohio voters preferring Republican candidates was somewhere between 54 and 81 percent. *Id.* at ¶ 106-108. These two facts led us to conclude that the original plan failed to comply with Section 6(B) because "the individuals who drew the plan did not try to comply with" the standard of that section and because they "did not have the right target in mind." *Id.* at ¶ 102.

{¶ 53} We also pointed out that the majority-party members' negotiation with the minority-party members—or even that party's acquiescence to a plan— does not necessarily indicate that the commission attempted to draw a plan that meets the Section 6(B) standard. *Id.*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 110-111.

{¶ 54} Finally, we relied on substantial expert evidence showing that "the commission could have drawn a more proportional plan." *Id.* at ¶ 112. This

evidence included the reports of Dr. Imai, who had created 5,000 simulated plans, none of which favored a party as strongly as the plan that had been adopted by the commission, and Dr. Rodden, who had purported to have drawn an Article XI–compliant plan that was more proportional than the plan that had been adopted by the commission. *Id.* This evidence, we explained, "further support[ed] the conclusion that the commission did not attempt to meet the standard set forth in Section 6(B)." *Id.* at ¶ 113.

*2. The commission violated Section 6(B)*

{¶ 55} Petitioners argue that like the invalidated plan, the revised plan violates Article XI, Section 6(B) because it does not "closely correspond[] with statewide voter preferences." We agree.

{¶ 56} Petitioners have presented a new report by their expert, Dr. Imai, who opines that the commission's methodology for assessing the revised plan's seat share grossly overestimates the number of Democratic-leaning seats. Dr. Imai points out that under the commission's method, two hypothetical districts having Republican vote shares of 49.9 percent and 50.1 percent would be classified as Democratic-leaning and Republican-leaning respectively, yet because their Republican vote shares differ by only .2 percentage points, their partisan leans are essentially the same. Both are truly "toss-up" districts. Yet the commission's methodology would count the first as a Democratic district and the second as a Republican one.

{¶ 57} Dr. Imai then demonstrates that the commission's revised plan contains 12 House districts in which the Democratic vote share is between 50 and 51 percent—nine of which have Democratic vote shares between 50 and 50.5 percent. The commission calls them all Democratic-leaning districts. Yet, Dr. Imai points out that the revised plan contains no House districts within one percent *above* a 50 percent Republican vote share—i.e., no similarly close districts that are labeled Republican-leaning. The closest Republican-leaning House district in the revised

plan has a Republican vote share of 52.6 percent. The following plot from Dr. Imai's report shows the disparity in the number of extremely close toss-up House districts assigned to each party:



The blue dots running in a line nearly parallel to the 50-percent line represent the dozen toss-up "Democratic-leaning" House districts that have been identified by Dr. Imai. This plot also visually demonstrates Dr. Imai's conclusion that "a shift in election results by just one percentage point towards the Republicans could lead to as many as 12 more Republican-won seats." Dr. Imai opines, "By counting what are really toss-up districts as 'Democratic-leaning' in this way, the Commission's methodology grossly overestimates the number of Democratic-leaning districts under the revised plan."

{¶ 58} Dr. Imai sets forth a different methodology that he claims provides a superior measure of a district's partisan lean. That methodology, which was also used in his initial report, looks at whether a Republican or Democrat would have won the district based on the data from each election out of the nine statewide elections between 2016 and 2020, the same election years used by the commission.

It then labels each seat fractionally—for example, Dr. Imai calculates that House district 52, which the commission calls "Democratic-leaning," would have been won by Republicans in four out of the nine elections, so his methodology counts that district as 4/9ths of a Republican-leaning seat and 5/9ths of a Democratic-leaning seat. (Dr. Imai applies this method to safer seats as well—for example, a seat counted as 8/9ths of a Republican seat.) According to Dr. Imai, when averaging across the 2016 through 2020 statewide elections, Republicans would have won 6 out of the 12 "toss-up" House districts that the commission has labeled Democratic-leaning. Using this method, Dr. Imai calculates that the Republican Party is expected to win 61.6 House seats.

{¶ 59} Dr. Imai compared this result to his 5,000 simulated plans. The revised plan's 61.6 Republican House–seat share is 2.7 seats higher than in the average simulated plan, which had 58.9 Republican House seats. In fact, all 5,000 of the simulated plans contained fewer than 61.6 Republican House seats. Dr. Imai opines that "[t]he difference between the revised plan and the average simulated plan exceeds 5 standard deviations of the simulated plans and is therefore statistically significant." He also compares the revised plan and the 5,000 simulated plans under a metric assessing the percentage of House seats a plan would net the Republican Party when compared with a strictly proportional plan. He calculates that the average simulated plan would contain 6.5 percent more Republican House seats than a strictly proportional plan, while the revised plan contains 9.2 percent more Republican House seats than a strictly proportional plan—a difference he again says is greater than five standard deviations and therefore statistically significant. He concludes that the revised plan makes it "almost certain for the Republican party to win disproportionately more seats relative to their statewide vote share."

{¶ 60} Article XI, Section 6 contains no specific language regarding the *methodology* that the commission is to employ when determining "[t]he statewide

proportion of districts whose voters * * * favor each political party," other than to provide that the calculation shall be "based on statewide state and federal partisan general election results during the last ten years." The parties have apparently agreed that 2016 through 2020 are the practicable years of data to use. Even using those same election years, Dr. Imai demonstrated how his method is preferable and more accurate than the commission's.

{¶ 61} But we need not endorse Dr. Imai's methodology to conclude that the commission's methodology, as applied here, violates Article XI, Section 6(B) of the Ohio Constitution. Bluntly, the commission's labeling of a district with a Democratic vote share between 50 and 51 percent (in one case, a district having a 50.03 percent vote share) as "Democratic-leaning" is absurd on its face. Section 6(B) requires the commission to attempt to draft a plan in which the statewide proportion of districts whose voters "favor" each party closely corresponds to the statewide voters' preferences. Here, the quality and degree of favoritism in each party's allocated districts is grossly disparate. When 12 of the 42 "Democratic-leaning" House districts (i.e., more than 25 percent) are very close "toss-up districts" yet there are 0 "Republican-leaning" districts that are similarly close, the proportion of districts whose voters "favor" each party is not being assessed properly.

{¶ 62} To be clear, we do not read Article XI, Section 6(B) as prohibiting the creation of competitive districts. But competitive districts—which the 12 districts identified by Dr. Imai surely are, under any reasonable measure—must either be excluded from the proportionality assessment or be allocated to each party in close proportion to its statewide vote share.

{¶ 63} Petitioners have established beyond a reasonable doubt that there are far fewer than 42 Democratic-leaning House districts in the revised plan. Yet even at 57 to 42 seats in the House and 20 to 13 seats in the Senate, petitioners have shown beyond a reasonable doubt that the commission did not attempt to adopt a

plan in which the statewide proportion of districts favoring each party closely corresponds to the statewide preferences of the voters. We are convinced that a more closely proportional plan could have been achieved. We cannot credit the claims of those who drew the revised plan that that plan was the most proportional one possible, because the map drawers misunderstood their task. They were guided by incorrect directives, began with an invalidated plan, and worked to eliminate closely Republican-leaning districts by turning them into competitive "Democratic-leaning" districts. The commission set its compass wrong, and it wound up in the wrong place.

{¶ 64} Finally, we reject the suggestion that our order constitutes a mandate to gerrymander to create Democratic-leaning districts. This suggestion implies that neither the September 2021 plan nor the revised plan were Republican-favoring gerrymanders. The evidence demonstrates otherwise. Throughout the process, the Republican map drawers refused to expressly work toward a 54 to 46 percent partisan share. Yet that is not a "superficial ratio," a "Democratic ratio," or an "arbitrary percentage," as one commissioner cavalierly dismissed it. Rather, as we made clear in *League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, it is a foundational ratio created not by this court or by any particular political party but instead etched by the voters of Ohio into our Constitution. To be sure, the ratio may be different in the next reapportionment, but for this reapportionment, the "statewide preferences of the voters of Ohio," Article XI, Section 6(B), are 54 percent in favor of the Republican Party and 46 percent in favor of the Democratic Party. The revised plan does not attempt to closely correspond to that constitutionally defined ratio. Our instruction to the commission is—simply—to comply with the Constitution.

### D. The election calendar

{¶ 65} In its response to petitioners' objections, the commission asks us to decide this matter by February 11, 2022, or, alternatively, to stay our decision until

the 2022 general election has been completed using the revised plan. The commission notes that the deadline for partisan candidates to file their candidacies for General Assembly offices was February 2 (*see* R.C. 3515.05 (candidate petitions are due 90 days before the primary election)) and that other deadlines related to the May 3 primary election are quickly approaching.

{¶ 66} The General Assembly established the date of the primary election, *see* R.C. 3501.01(E)(1), and it has the authority to ease the pressure that the commission's failure to adopt a constitutional redistricting plan has placed on the secretary of state and on county boards of elections by moving the primary election, should that action become necessary.

## IV. CONCLUSION

{¶ 67} We sustain petitioners' objections relating to the revised plan's violation of Article XI, Sections 6(A) and 6(B) of the Ohio Constitution. We invalidate the revised plan in its entirety. We further order the commission to be reconstituted, to convene, and to draft and adopt an entirely new General Assembly–district plan that conforms with the Ohio Constitution, including Article XI, Sections 6(A) and 6(B) as we have explained those provisions above.

{¶ 68} We further order the commission to adopt the new plan and file it with the secretary of state no later than February 17, 2022, and to file a copy of that plan with this court by 9:00 a.m. on February 18, 2022. We retain jurisdiction for the purpose of reviewing the new plan.

{¶ 69} Petitioners shall file objections, if any, to the new plan, by 9:00 a.m., three days after the plan is filed in this court. Respondents shall file responses, if any, to the objections, by 9:00 a.m., three days after the objections are filed. If the deadline for the objections or responses falls on a Saturday, Sunday, or holiday, the objections or responses shall be filed by 9:00 a.m. on the next business day. Petitioners shall not file a reply or any motion for leave to file a reply. The clerk

shall refuse to accept any filings under this paragraph that are untimely or prohibited.

{¶ 70} No requests or stipulations for extension of time shall be filed, and the clerk of this court shall refuse to file any requests or stipulations for extension of time.

{¶ 71} Because we sustain the objections as to Sections 6(A) and 6(B) and invalidate the plan in its entirety, we do not reach petitioners' objections regarding Article XI, Sections 1 and 3(D)(3).

Objections sustained in part.

O'CONNOR, C.J., and DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY and DEWINE, JJ., dissent, with an opinion.

FISCHER, J., dissents, with an opinion.

––––––––––––––––––

**KENNEDY and DEWINE, JJ., dissenting.**

{¶ 72} We dissent from the majority's pronouncement that the revised General Assembly-district plan violates Article XI, Sections 6(A) and 6(B) of the Ohio Constitution and is therefore invalid. And we disagree with the majority's decision to retain jurisdiction over this case and to set arbitrary time limitations and new rules for the Ohio Redistricting Commission's work that have no basis in the text of the Ohio Constitution.

{¶ 73} It is apparent that in disregard of constitutional standards, four members of this court have now commandeered the redistricting process and that they will continue to reject any General Assembly-district plan until they get the plan they want. It would simplify matters if the commission would just provide the majority with the map-drawing software, Maptitude, so that they can draw the map themselves. At this point, one must wonder which seven-member body is the true redistricting commission—the constitutionally named officers or this court?

{¶ 74} The Ohio Constitution entrusts the responsibility for redistricting to the commission, not to this court. In its previous decision, the majority exceeded its authority by declaring a map invalid based on alleged violations of Article XI, Sections 6(A) and 6(B), despite the fact that our Constitution does not make stand-alone violations of these sections judicially enforceable. Today, the majority doubles down on its error by invalidating a revised plan that satisfies the same metrics that it held out as a model of constitutionality in its first decision. In today's astonishing order, the majority compels the commission to design districts that guarantee Democratic victories. There is a word for the action the majority has ordered the commission to undertake—gerrymandering. *See* Article XI, Section 6(A), Ohio Constitution.

{¶ 75} Article XI, Section 6(A) provides that the commission "shall attempt" to adopt a plan that is not "drawn primarily to favor or disfavor a political party," and Section 6(B) directs it to draw the plan so that "[t]he statewide proportion of districts whose voters * * * favor each political party shall correspond closely to the statewide preferences of the voters of Ohio." The evidence submitted by petitioners in these cases confirms that the districts that the majority finds objectionable "favor" Democrats. Majority opinion, ¶ 30, 50. The majority now, however, holds that it is not enough that a district "favor" a political party; it now decrees that the commission must draw districts that favor Democrats to a degree of the majority's liking. But nothing in the Ohio Constitution requires the creation of districts that guarantee victories for a political party. The Constitution requires only an attempt to create districts that *favor* one side or the other in close correspondence to statewide preferences, and that is exactly what the revised map does.

{¶ 76} Furthermore, the majority lacks the authority to impose deadlines on the commission and to retain jurisdiction for the purpose of reviewing a new plan. When a plan is invalidated by a court, Article XI, Section 9(B) mandates the

reconstitution of the commission pursuant to Section 1. Once reconstituted, the commission is required to "convene, and ascertain and determine a general assembly district plan in conformity with" the provisions of Article XI that are still valid. Article XI, Section 9(B), Ohio Constitution. Therefore, the work of the commission is controlled by the Ohio Constitution, not by judicial fiat. The arbitrary timeline set by the majority usurps the right of the people to have a voice in the redistricting process that is guaranteed by Article XI, Section 1(C). By rejecting the revised plan, improperly retaining jurisdiction over these cases, and setting another arbitrary deadline of ten days, it is apparent that the majority has in mind the number of Democratic-leaning districts that must exist and the percentage of voters that is necessary in a district to guarantee electoral victories for Democrats. Things would be much easier if they just told the commission exactly what they want.

{¶ 77} We reject the assertion that the revised plan violates Article XI, Section 1(C); that provision is directory and not judicially enforceable. The commission concedes that the revised plan contains a few municipal splits that violate Article XI, Section 3(D)(3). Because these violations are "isolated" and do not materially affect the plan, the commission should amend the plan to correct the violations pursuant to Article XI, Section 9(D)(3)(a).

{¶ 78} Therefore, we would overrule the objections claiming that the revised plan is invalid under Sections 6(A), 6(B), and 1(C), sustain the objection regarding the isolated violations of Section 3(D)(3) as conceded by the commission, and order the commission to amend the revised plan pursuant to Section 9(D)(3)(a) to correct those minor violations. Because the majority holds otherwise, we dissent.

## I. FACTS AND PROCEDURAL HISTORY

*A. The General Assembly-District Plan Is Invalidated*

*and a Revised Plan Is Adopted*

{¶ 79} On January 12, 2022, a divided court invalidated the original General Assembly-district plan adopted by the commission on September 16, 2021, and directed the commission to adopt a new plan within ten days.

{¶ 80} The commission reconvened and held its first public meeting on January 18, 2022. The commission did not start from scratch; instead, it directed staff to collaborate and determine which currently Republican-leaning districts could be redrawn to be Democratic-leaning districts without violating the requirements of Article XI, Sections 2, 3, 4, 5, and 7. The commission unanimously agreed to take a regional approach to redrawing the map. It started with Hamilton and Franklin Counties, with a goal of meeting the proportionality requirement unless doing so would result in violations of other constitutional requirements. Over the following days, support staff discussed and shared proposals for increasing the number of Democratic-leaning districts, particularly in Hamilton, Franklin, Cuyahoga, Summit, and Lorain Counties. Senator Vernon Sykes, a Democrat and a member of the commission, stated: "The staffs have been working together. This is the first time, I believe, in the history of the state that Republican and Democratic staff have been working together on maps."

{¶ 81} On January 20, 2022, the commission held a public meeting; rather than adjourning the meeting, the commission went into recess. When it reconvened on January 22, commission members introduced proposed plans. The commission, by a party-line vote, adopted the plan prepared by members of the Republican caucus in collaboration with, but not always agreement with, members of the Democratic caucus.

*B. The Realities of Ohio's Political Geography*

**{¶ 82}** Before we get to the revised map, some background is necessary to understand the constraints under which General Assembly redistricting takes place in Ohio.  Start with Ohio's political demographics.  No one disputes the fact that the partisan preferences of Ohio voters are not evenly distributed.  Democratic voters are clustered predominately in densely populated areas around Ohio's six largest cities.  Republicans are more uniformly distributed—and large, rural swaths of the state are solidly Republican as the below maps show:[9]



---

9. The first map is from the expert report of Michael Barber, Ph.D.  The second map is from the expert report of Sean P. Trende.



Importantly for redistricting purposes, the concentration of Democratic voters is much higher in Democratic areas than that of Republican voters in Republican-leaning areas. Election results[10] from the most recent presidential election help illustrate this point (the percentage is the Republican-vote share in each county):

10. This map was created using data from the Ohio Secretary of State's Office. *See* Ohio Secretary of State, 2020 Official Elections Results, available at https://www.ohiosos.gov/elections/election-results-and-data/2020/ (accessed Feb. 7, 2022) [https://perma.cc/FY23-HYMD].  It was created using a template available at https://commons.wikimedia.org/wiki/File:Ohio_Presidential_ Election_Results_2020.svg (accessed Feb. 7, 2022) [https://perma.cc/BBR5-SXGH].



{¶ 83} Now layer on top of this political reality the mandatory requirements of the Ohio Constitution. Districts must be compact and contiguous, and there are explicit limitations on splitting political subdivisions. Restrictions against splitting political subdivisions are explicitly given precedence over the exhortations of Article XI, Sections 6 that a plan shall not be drawn to favor a political party and shall closely correspond to the statewide voter preferences.

{¶ 84} As Dr. Michael Barber explained, the constitutional requirements for territorial continuity, district compactness, political-unit integrity, and proportionality are in tension with the creation of a map that achieves proportional representation along party lines. Compliance with these requirements means that Democrats tend to be clustered in districts that result in so-called "wasted votes" in which Democrats win by overwhelming numbers while Republicans tend to be in more competitive districts in which Republican candidates win by smaller margins.

{¶ 85} Dr. Barber detailed the challenges facing mapmakers who want to achieve exact proportionality by creating House districts that correspond to the preferences of Ohio voters (i.e., 54 Republican seats to 45 Democratic seats). He described the following demographic breakdown of the state:

- 65 counties are uniformly Republican and represent approximately one-third of the House districts.

- 17 counties are "purple cluster" counties—counties that are uniformly Republican except that they have a small-to-medium municipality that is majority Democratic. These represent 26 House districts, but only 5 could be drawn as Democratic districts in compliance with the requirement to avoid splitting governmental units.

- 6 "urban blue" counties, which split approximately 60 percent Democratic and 40 percent Republican and account for approximately 41 House districts.

{¶ 86} Based on these demographics, a mapmaker who seeks to achieve anything close to 45 Democratic-leaning districts faces significant challenges. A

mapmaker would need to draw all 5 possible Democratic-leaning districts in the "purple cluster" counties, and 40 out of the 41 "urban blue" districts would have to be Democratic. In other words, for the statewide proportion of House districts to achieve exact proportionality, the commission would need to go to extraordinary lengths to draw districts in the purple-cluster counties and the urban blue counties in a way that gives maximum political advantage to Democrats. That is, a plan that overcomes Ohio's political geography would necessarily provide Democrats with virtually all the available seats in urban counties—a far cry from the representation that voting preferences in those counties would merit.

### C. Issues Presented

{¶ 87} These cases present two issues for this court's consideration: Does this court have authority to invalidate the revised General Assembly-district plan based on stand-alone violations of Article XI, Sections 1 and 6? The answer is no. And have the petitioners in *Bennett v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1198) demonstrated that the commission violated Article XI, Section 3(D)(3)? The answer to that question is yes. As the commission concedes, the revised plan contains isolated violations of Article XI, Section 3(D)(3), and pursuant to Section 9(D)(3)(a), this court should remand the revised plan to the commission to correct those violations.

### II. ANALYSIS

#### A. Judicial Reviewability of a General Assembly-District Plan

{¶ 88} As the first dissenting opinion explains in *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, Article XI, Section 9(D) limits this court's authority to review General Assembly-district plans. ___ Ohio St.3d ___, 2022-Ohio-65, ___ N.E.3d ___, ¶ 227 (Kennedy, J., dissenting). The power to invalidate a plan, in whole or in part, depends on the existence of a predicate violation of the requirements of Section 2, 3, 4, 5, or 7. For "isolated violations of those requirements," Section 9(D)(3)(a) requires this court to order the commission to

amend a plan to remedy the violations. When the violations are more extensive, requiring the commission to amend at least six House districts or two Senate districts, Section 9(D)(3)(b) directs the court to wholly invalidate the plan. Finally, Section 9(D)(3)(c) permits the court to invalidate a plan adopted under Section 8(C) if a significant violation or violations of Section 2, 3, 4, 5, or 7 materially affect the ability of the plan to provide proportional representation and the proportion of districts does not correspond closely to the statewide preferences of Ohio voters.

{¶ 89} Contrary to the majority's claim, nothing in Article XI, Section 9(B) empowers this court to invalidate the revised plan based on a stand-alone violation of Section 6. Further,

> the negative implication of Article XI, Section 9 is obvious. Section 9(D) is a provision that limits the authority of this court in reviewing a General Assembly-district plan. It prohibits this court from ordering the commission to adopt a specific plan and from drawing the districts ourselves. And that same provision provides that this court may invalidate a General Assembly district-plan in whole or in part only if we first find a violation of Article XI, Section 2, 3, 4, 5, or 7.

*Id*. at ¶ 227 (Kennedy, J., dissenting).

{¶ 90} Indeed, "[i]f violations of Section 6 were intended to be actionable, one would naturally expect Section 9(D) to say so. But that language is conspicuously absent." *Id.* at ¶ 217 (Kennedy, J., dissenting). The exclusion of Section 6 from the remedies expressly provided by Section 9(D)(3) demonstrates that such violations are not judicially enforceable—the inclusion of Sections 2, 3, 4, 5, and 7 in this remedy portends the exclusion of Section 6. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). For this reason, "the

standards established by Article XI, Section 6 are directory and therefore not judicially enforceable." *League of Women Voters* at ¶ 245 (Kennedy, J., dissenting).

**{¶ 91}** Because this court lacks authority to invalidate a plan based on a stand-alone violation of Sections 6(A) or 6(B), petitioners' objections that are premised on those provisions fail.

### B. The Commission Did Not Violate Article XI, Section 6

**{¶ 92}** Because there has been no showing of the necessary predicate violation of Article XI, Section 2, 3, 4, 5, or 7, this court has no authority to wholly invalidate the plan for a violation of Section 6. Nevertheless, because the majority ignores this limit on its authority, we address the majority's conclusion that the revised plan violates Sections 6(A) and 6(B).

**{¶ 93}** Article XI, Section 6 establishes three standards that the commission must "attempt" to follow when drawing a General Assembly-district plan. The commission must attempt to produce a map that (A) is not drawn primarily to favor a political party, (B) contains a statewide proportion of districts whose voters favor a political party in close correspondence to statewide voter preferences, and (C) contains compact districts. But in pursuing these goals, the commission shall not violate Section 2, 3, 4, 5, or 7—the neutral map-drawing requirements designed to prevent gerrymandering.

### 1. The Revised Map Does Not Violate Article XI, Section 6(A)

**{¶ 94}** Article XI, Section 6(A) provides, "No general assembly district plan shall be drawn primarily to favor or disfavor a political party." The operative word in the provision is "primarily," which is ordinarily understood to mean "predominantly." Therefore, under the plain language of this provision, to show a violation of Section 6(A), petitioners needed to prove that the commission's *predominant* motivation in drawing the revised plan was to favor or disfavor a political party.

### a. There has been no showing that partisan favoritism
### was the commission's primary motivation

{¶ 95} Petitioners argue that the commission did not attempt to comply with Article XI, Section 6(A). The crux of the argument is that the commission's revised map purposefully creates districts that lean toward Democrats only marginally, and, so petitioners say, Republicans might end up winning some of these districts and obtaining a greater than proportionate share of representation. We disagree that the commission's predominant motivation was to favor a political party.

{¶ 96} The commission's members understood that under the majority's holding in *League of Women Voters*, they had to comply with Sections 6(A) and 6(B) unless doing so caused the revised plan to violate Section 2, 3, 4, 5, or 7. The staffs of the Republican and Democratic caucuses collaborated intensely in drawing a map, even if there was not always agreement on how each district should be drawn. Mapdrawer Ray DiRossi explained that "the Commission decided to proceed with this Court-ordered re-draw by drawing districts in various geographic regions of the state where it is possible to draw Democratic leaning districts while complying with Sections 2, 3, 4, 5, and 7 of Article XI of the Ohio Constitution." This way, they started with a plan that they knew already complied with Sections 2, 3, 4, 5, and 7. Even then, DiRossi noted that it took "hours of work" to change a Republican-leaning district to lean toward Democrats, but because of this court's order for the commission to adopt a revised plan in ten days, time was short. DiRossi explained that it was not possible to adopt a map that had fewer than 57 Republican-leaning House districts without also violating other provisions of Article XI, and he testified that other proposed maps he had seen did not comply with all the requirements of Sections 2, 3, 4, 5, and 7. Blake Springhetti, a Republican staffer who helped draw the revised plan, also noted that he had not seen a constitutional map that gave Democrats more districts than the commission's revised map.

{¶ 97} When asked why the revised plan made Democratic-leaning seats more competitive, Springhetti explained that "the decisions were centered around complying with the court order and closely corresponding with Section 6." And in responding to a question whether drawing competitive districts was intended to disfavor Democrats, DiRossi stated, "[I]f you're asking if a 53 percent Republican-leaning seat that becomes a 48 percent Republican-leaning seat is—makes it easier for a Republican to win, I mean, that just wouldn't make sense to me."

{¶ 98} Petitioners' own expert, Dr. Kosuke Imai, admitted that in the revised plan's most competitive district, Democrats would win the election five out of nine times. And in the four next most competitive districts, Democrats could have won at least six out of nine elections. It stands to reason that the other seven competitive districts with larger margins of political advantage for the Democrats would have been even more likely to elect Democratic legislators.

{¶ 99} In effect, petitioners assert, and the majority apparently agrees, that the revised plan does not favor the Democratic Party enough. But changing the map to add more "safe" Democratic districts would mean that the commission had a primary purpose to favor the Democratic Party when Article XI, Section 6(A) strictly prohibits such action.

### b. The majority's Section 6(A) analysis

{¶ 100} The majority does not cite any direct evidence that partisan favoritism was the drafters' primary motivation. Instead, it draws inferences from three sources to support its conclusion that the commission's primary motivation was to favor the Republican Party: (1) the fact that the commission took as a starting point the map this court previously invalidated in drawing new districts, (2) the fact that the map did not achieve perfect partisan proportionality, and (3) the fact that many of the districts favored the Democratic Party only by small margins. This evidence does not prove the majority's faulty conclusion.

{¶ 101} The majority begins by complaining that "the commission did not adopt an entirely new plan" but, rather, began by making revisions to the old map. Majority opinion at ¶ 36. But, of course, this has nothing do with whether the commission intended to "primarily" favor or disfavor a political party. It was a Democratic member of the commission, Senator Sykes, who proposed the idea to adopt the "regional" approach to grapple with the reality of Ohio's political geography. Starting from the invalidated map was a bipartisan decision, motivated primarily by the need to comply with the majority's order to redraw the plan within ten days. Certainly, the decision is not evidence that the commission's primary motivation was to favor Republicans.

{¶ 102} Moreover, there is nothing in Article XI that authorizes the majority to micromanage the manner in which the commission carries out its map-drawing functions. The commission's unanimous decision to take a regional approach to redrawing the plan makes perfect sense when one considers that no one challenged the previous plan for failing to comply with the neutral line-drawing requirements of the Constitution. Indeed, starting completely from scratch would have made little sense. The Constitution mandates that the starting point for the creation of the districts be Franklin County, the most populous county, and it also mandates the order in which the remaining districts be drawn. So, any new map would have been based on the same parameters as the old one.

{¶ 103} Furthermore, the demographics of Ohio dictate that Ohio's rural districts are going to be Republican; readjustments of the boundaries of these districts would have done nothing to change the Republican/Democratic ratio of districts. The only place for the commission to add more Democratic districts was in the urban counties. So, it was perfectly reasonable for the commission to start exactly where it did.

{¶ 104} Second, the majority infers that the drafters had an improper partisan motivation from the fact that the revised plan did not achieve perfectly

42

proportional representation. In doing so, it conflates the issue of proportionality under Article XI, Section 6(B) with the intent determination of Section 6(A). Section 6(B) is a mathematical problem. It asks whether the statewide proportion of districts "correspond[s] closely" to the statewide preference of voters. Section 6(A) is a question of intent and asks whether the commission acted above all else to favor or disfavor one party over the other. The fact that the majority today does not view the revised plan as sufficiently proportional does not prove that the commission intended to favor or disfavor a particular party. As explained below in the discussion of Section 6(B), the majority's decision in *League of Women Voters*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, suggested that the partisan proportionality of the revised plan would comply with Section 6(B). At best, the proportionality of the revised plan shows that the commission acted primarily to obey the majority's order, not to disfavor Democrats.

{¶ 105} Lastly, the majority today finds "other evidence" that supports a violation of Article XI, Section 6(A) in a lack of "parity in terms of vote share of each district." Majority opinion at ¶ 40. But competitive districts do not favor or disfavor a particular political party, so they cannot be evidence of the commission's intent to disfavor the Democrats. Rather, the narrow margins of partisan preference were largely a function of demographics. As outlined above, the political demographics of Ohio meant that in order to obtain proportionality, the overwhelming majority of Republican districts in Ohio's urban counties had to be transformed into Democratic ones despite the fact that Republican voters constitute a significant proportion of Ohio's urban population. This necessarily meant drawing districts having small Democratic margins. Furthermore, by allowing the commission so little time to revise the plan, the majority exacerbated these constraints, as changing even one district to lean toward Democrats was time consuming. The drafters also had to comply with Sections 2, 3, 4, 5, and 7, without losing sight of the compactness standard of Section 6(C).

{¶ 106} The record establishes that the commission's primary purpose in adopting the revised plan was to comply with this court's order to adopt a plan with a proportion of districts that more closely corresponds with the partisan preferences of Ohio voters without also violating the neutral map-drawing requirements of Article XI and dealing with the consequences of Ohio's political geography. The plan therefore was not drawn primarily to favor or disfavor any particular political party. Partisan considerations are not forbidden by Section 6(A); they just must not be the primary motivation in drawing the plan, and here they were not.

{¶ 107} For these reasons, we would reject the objections premised on a violation of Article XI, Section 6(A).

### 2. The Revised Plan Does Not Violate Article XI, Section 6(B)

{¶ 108} Going further, the majority concludes that the redistricting commission did not comply with this court's direction in *League of Women Voters* that the commission attempt to adopt a plan under Article XI, Section 6(B) in which "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party * * * correspond closely to the statewide preferences of the voters of Ohio."

### a. The Majority's Decision in *League of Women Voters of Ohio*

{¶ 109} In *League of Women Voters*, this court explained that prior election results showed "about 54 percent of Ohio voters preferred Republican candidates and about 46 percent of Ohio voters preferred Democratic candidates." __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 108. Based on this distribution of partisan preference, precise proportionality would mean that there are 71.28 total House and Senate districts (54 percent of the sum of the 99 House districts and 33 Senate districts) that lean toward the Republicans and 60.72 that lean toward the Democrats (46 percent of the same sum). But close correspondence is not precise proportionality. By modifying the word "correspond" with the adverb "closely," Article XI, Section 6(B) provides that proportionality need not be exact but just

44

close enough. In contrast, the word "favor" in Section 6(B) is not similarly modified. If a district prefers a political party by the smallest statistical amount, it necessarily favors that party. In this analysis, there can be no toss-ups; one party is favored based on past election data, and one is not.

{¶ 110} But how does the majority understand the term "closely"? It is important to consider what it suggested was close enough in *League of Women Voters*. In determining that the commission's original plan did not comply with Article XI, Section 6(B), the majority pointed to the report of Dr. Imai, an expert in districting statistics who was hired by petitioners. *Id.* at ¶ 112. Dr. Imai's original report filed in these cases stated that the average of the 5,000 plans he generated contained 79 total Republican-leaning districts (60 percent) and 53 total Democratic-leaning districts (40 percent). The majority stated, "Dr. Imai's analysis showed that the plan adopted by the commission was an outlier, displaying a greater degree of disproportionality than any of the simulated maps he generated." *Id.*

{¶ 111} The majority in *League of Women Voters* also relied on Dr. Jonathan Rodden's report and stated that "[he] drew a plan that was *compliant with Article XI* and that is more proportional to the statewide voter preferences than the plan adopted by the commission." (Emphasis added.) *Id.* at ¶ 112. It further claimed that "when Dr. Rodden drew his district plan that adhered to traditional redistricting principles, *complied with Article XI*, and did not endeavor to help or harm any political party, the result was much different: a plan with more compact districts and in which the partisan split in Republican candidates' favor was 57 percent to 43 percent in the House and 55 percent to 45 percent in the Senate." (Emphasis added.) *Id.* at ¶ 126. The majority in *League of Women Voters of Ohio* unambiguously stated that Dr. Rodden's plan complied with Article XI, including Section 6(B).

{¶ 112} Notably, after *League of Women Voters* was decided, a notice of correspondence was filed in this court in which counsel for the *Bennett* petitioners

informed the commission that Dr. Rodden's plan did not comply with the mandatory map-drawing requirements of Article XI, stating, "[W]e now believe that [Dr. Rodden's] plan contained some technical issues that may result in municipal corporation and township splits beyond those permitted by the strict language of Article XI, Section 3." Dr. Rodden's original plan also did not number the Senate districts, as required by Article XI, Section 5. And it is not clear that he began drawing House districts with the most populous county—Franklin County— as required by Section 3(C)(1). This is problematic, because Dr. Rodden stated in his report that he began preparing his plan by first "resolving the dilemma of Northeast Ohio." Nonetheless, the majority in *League of Women Voters* favorably cited Dr. Rodden's plan in its decision. Consequently, despite the flaws in Dr. Rodden's work, the clear message that the majority sent to the commission was that a plan having levels of proportionality similar to those determined by Dr. Rodden would withstand constitutional scrutiny.

{¶ 113} In addition, the commission was aware that on September 13, 2021, a Democratic member of the commission, Senator Sykes, had previously proposed a plan that contained 77 total Republican-leaning House and Senate districts and 55 Democratic-leaning House and Senate districts. *See League of Women Voters*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 46.

### b. The Majority Moves the Goalposts

{¶ 114} Against this backdrop in which the majority had set Dr. Imai's and Dr. Rodden's reports as exemplars for drawing a plan that is compliant with Article XI, Section 6(B), the commission adopted the revised plan, which provided 77 total Republican-leaning districts in the House and Senate—about 58 percent—and 55 total Democratic-leaning House and Senate districts—about 42 percent. By the standards set forth by the majority in *League of Women Voters*, the revised plan is constitutional. In its previous decision, the majority relied on Dr. Imai's simulation in concluding that the original plan was an "outlier," *id.* at ¶ 112, but under the

same data, the revised plan is not. In fact, the revised plan provides more total Democratic-leaning districts than the majority of Dr. Imai's 5,000 simulated plans. Further, the partisan makeup of the revised plan is almost identical to the partisan makeup of Dr. Rodden's original plan—the plan that the majority held up as a model of constitutionality in its original decision. The revised plan also contained the exact division of total Republican- and Democratic-leaning districts proposed in Senator Sykes's September 13, 2021 plan. According to the majority, the plan initially proposed by the minority-party members of the commission would somehow unconstitutionally favor their opposing party. That is as good of an indication as any of just how far afield the majority has veered.

{¶ 115} Indeed, a fair reading of the majority's previous decision is that the revised plan satisfies Article XI, Section 6(B), and the majority is now simply moving the goalposts to avoid upholding the plan. What it indicated in its previous decision regarding what would be a close enough division of districts is no longer close enough. Instead, under today's decision, the commission must undertake a reverse-gerrymandering to guarantee Democratic victories to achieve exact proportional representation.

{¶ 116} The majority asserts that the existence of alternative plans is probative in evaluating the revised plan. It should then be relevant that Dr. Rodden submitted to the commission a revised plan containing 74 total Republican-leaning districts and 58 total Democratic-leaning ones. But although that plan may contain a slightly more proportional division of districts than the commission's revised plan, it does so at the expense of once again violating some of the mandatory map-drawing requirements of Article XI. The commission submitted evidence that Dr. Rodden's plan unconstitutionally divided more than one municipality or township in nine districts, in violation of Article XI, Section 3(D)(3). Some of these divisions could not be corrected without overpopulating or underpopulating the district, sending ripple effects throughout the entire plan. Dr. Rodden's plan also

erroneously numbered numerous Senate districts, *see* Article XI, Section 5, causing at least one senator to be up for reelection two years before the conclusion of his term.

{¶ 117} Therefore, while the majority faults the commission for not adopting a more proportional plan, it is significant that no plans that were both more proportional and satisfied the other relevant constitutional standards were presented to the commission.

### c. It Is Not Possible to Draw Perfectly Proportional District Plans

{¶ 118} DiRossi testified that none of the plans he had seen provided proportional representation without also violating other requirements of Article XI. Apparently not liking what DiRossi says, the majority simply disregards his testimony. But DiRossi's testimony is backed up by other evidence in the record. Dr. Rodden is an expert in matters pertaining to redistricting, but even he was not able to draft a plan with a proportion of districts that more closely corresponds with the partisan preferences of Ohio voters while still complying with the neutral map-drawing requirements of Sections 2, 3, 4, 5, and 7. Similarly, Senator Sykes's September 13 plan and the Ohio Citizens Redistricting Commission's plan, which were both cited in Dr. Rodden's first report, were not able to reach much closer proportionality even though they also violated the neutral map-drawing requirements and were therefore unconstitutional.

{¶ 119} Further, out of all of Dr. Imai's 5,000 simulated plans that he claimed complied with all of Article XI's requirements, *none* of the plans were able to reach perfect proportionality, i.e., 71.28 total Republican-leaning House and Senate districts and 60.72 total Democratic-leaning House and Senate districts. *None* even came within 5 percent of perfect proportionality. His average ratio was between slightly more than 78 Republican-leaning districts and slightly more than 53 Democratic-leaning districts, and his plans ranged from approximately 76 districts leaning Republican to 81 leaning Republican. The commission's revised

plan is therefore more proportional than the majority of Dr. Imai's 5,000 plans. And to reach the proportionality apparently required by the majority's decision today, the plan would be an outlier in Dr. Imai's study, with about five fewer Republican districts than even his most pro-Democratic simulated plan.

{¶ 120} And while the Democratic members of the commission prepared a plan purportedly containing 72 total Republican-leaning House and Senate districts and 60 total Democratic-leaning House and Senate districts, all indications are that the plan included little if any attempt to comply with all the requirements of Article XI, Sections 2, 3, 4, 5, and 7. Senator Sykes noted that the purpose of his plan was to show that proportional districts could be drawn, without worrying whether they were "error free." And the plan contained constitutional errors, improperly dividing municipalities and townships in a way that cannot be corrected without overpopulating some districts and "caus[ing] ripple effects throughout the entire county, and likely beyond." It also improperly numbered some Senate districts in a way that puts at least two senators on the ballot in the middle of their four-year terms, violating Article XI, Section 5. (The drafter of this plan, Chris Glassburn, claimed that he was subsequently able to correct these errors, but the maps attached to his affidavit are, at the very least, not numbered, in violation of Sections 3, 4, and 5.)

{¶ 121} The majority should apply the plain language of Article XI, Section 6(B) and not demand exact proportionality when there is scant evidence that it is possible to draw districts that are exactly proportional to the partisan preferences of Ohio voters without also violating the neutral map-drawing requirements of Sections 2, 3, 4, 5, and 7. Section 6(B) states that the commission shall "attempt" to achieve a proportion of districts that "closely" corresponds to the partisan preferences of Ohio voters—it does not require that proportion to perfectly match those preferences.

**d. The Revised Plan Does Not Improperly Favor a Political Party**

{¶ 122} Lastly, the majority rejects the commission's methodology for determining how many districts favor Republicans and how may favor Democrats. It concludes that the commission's revised plan would result in more Republican election victories than the plan purports to have because Republicans might win in some districts where Democrats have only a narrow demographic advantage. However, nothing in Article XI, Section 6(B) requires the commission to allocate guaranteed victories to any party. Rather, Section 6(B) directs the commission to adopt a plan in which "[t]he statewide proportion of districts whose voters * * * *favor* each political party shall correspond closely to the statewide preferences of the voters of Ohio." (Emphasis added.) Article XI, Section 6(B), Ohio Constitution. It does not give a margin by which the district's voters should favor one party or the other. And although the margins may be narrow in some districts, those districts nonetheless favor Democrats based on the partisan preference of voters there. The Constitution's words control: a district that narrowly favors the Democratic Party nevertheless favors it.

{¶ 123} To require these districts to favor Democrats enough to guarantee that Democrats will always be elected—i.e., to significantly favor a party by more than 52 percent—would require adding words to the Constitution; however, a court may not "add to or subtract from the plain and usual meaning of [a] constitutional provision," *State v. Billotto*, 104 Ohio St. 13, 15-16, 135 N.E. 285 (1922).

**e. The Majority's Holding Requires Intentional Gerrymandering**

{¶ 124} The result of the majority's decision today is to require the commission to intentionally gerrymander the General Assembly-district plan in order to overcome the political geography of Ohio in which Democrats are more concentrated in urban areas while Republican voters dominate the suburban and rural areas of the state. To draw five more safe Democratic-leaning districts, the commission will have to crack the areas in which Democrats live and pack them

into new districts containing far-flung Republican voters in the suburbs and rural areas. Dr. Barber, an associate professor of political science at Brigham Young University, indicated that this could be accomplished by drawing districts that radiate from the urban core and then extend them "like slices of pizza," which would capture large numbers of Democrats in cities as well as Republican voters in the suburbs and rural areas. He also suggested that districts could be drawn like a "snake" through the rural, heavily Republican areas by stringing together smaller cities where Democrats live to create a majority Democratic-leaning district in what would otherwise be a Republican-leaning district.

{¶ 125} The problem, Dr. Barber notes, is that creating these districts requires intentional gerrymandering and violates Article XI's neutral map-making requirements. The "slice" districts would violate Section 3(D)(3) by dividing too many municipalities and townships, while the "snake" districts would violate Section 3(C)'s prohibition of excessive divisions of counties. Creating "snake" districts would also require the commission to violate the directory duty imposed by Section 6(C) to draw compact districts. Complying with this court's apparent order to create exactly proportional districts improperly elevates Section 6(B) over Sections 2, 3, 4, 5, and 7, which the Constitution expressly prioritizes, and over Section 6(C), which is coequal to Section (6)(B). *See* Article XI, Section 6, Ohio Constitution ("Nothing in this section permits the commission to violate the district standards described in Section 2, 3, 4, 5, or 7 of this article").

{¶ 126} It also will require the commission to go to absurd lengths to dilute Republican votes in urban counties. For example, Dr. Rodden's plan divides 11 districts in Franklin County in such a way that all 11 districts would skew in favor of Democrats. So, while the partisan divide of Franklin County is approximately 63 percent Democrats and 37 percent Republicans, Dr. Rodden's plan would give 100 percent of the districts to the Democrats. Similarly, Hamilton County is 55 percent Democrats and 45 percent Republicans. Dr. Rodden's plan, however,

would provide six out of seven House districts (or approximately 85 percent) to Democrats by cracking Republican-leaning areas of the county and packing them with urban areas where Democrats predominate. This intentional gerrymandering therefore unnecessarily dilutes the votes of Republican voters in the areas surrounding cities.

{¶ 127} The same majority as today recently decried the evils of partisan gerrymandering:

> Gerrymandering is the antithetical perversion of representative democracy. It is an abuse of power—by whichever political party has control to draw geographic boundaries for elected state and congressional offices and engages in that practice—that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party.

*Adams v. DeWine*, __ Ohio St.3d __, 2022-Ohio-89, __ N.E.3d __, ¶ 2. Yet today, it apparently orders the commission to do just that, compelling the commission to separate political subdivisions and communities of interest and to dilute the vote of some Ohioans to enhance the vote of others. This is the direct result of the majority's failing to adhere to the limits of the Constitution and elevating Article XI, Section 6(B) by replacing the neutral map-drawing requirements with one that is unapologetically partisan. And this is plainly not what the people of this state had in mind when they ratified the limits on gerrymandering in Article XI.

{¶ 128} Redistricting reform was intended to reduce political polarization. But in putting its own political objectives ahead of constitutional requirements, the majority will undoubtedly increase political polarization. The majority ordains a map in which urban counties effectively have representation from only one political

party. For those who complain about a rural/urban division in Ohio, just wait until we have a legislature in which one party exclusively represents urban centers and the other party represents the rest of the state.

{¶ 129} Furthermore, by the majority's decree, elections in urban counties will not be competitive. Instead, the commission must guarantee safe Democratic seats—taking general-election voters out of the equation and ensuring that elections are decided by the lines that are drawn and not by the ballots cast. Under such a regime, the most important election will often be the primary—thereby incentivizing candidates to appeal to their political base rather than the electorate as a whole. That is not good for voter engagement. And that is not good for democracy.

*C. This Court Has No Authority to Commandeer the Commission*

{¶ 130} In addition to erroneously concluding that the commission violated Article XI, Section 6, the majority exceeds its constitutional authority by placing an arbitrary time limit on the work of the commission and by retaining jurisdiction over the case. Under Section 9(B), if this court invalidates a plan, the reconstitution of the commission is self-executing—it occurs automatically and the commission is to "convene, and ascertain and determine" a new plan "in conformity with such provisions of this constitution as are then valid." Article XI, Section 9(B), Ohio Constitution.

{¶ 131} Article XI does not authorize this court to control the work of the commission. It does not prohibit the commission from using an invalidated plan as a starting point as it strives to adopt a valid one. The Constitution is silent on when the commission is to hold meetings, adopt rules, hire staff, expend funds, or propose or adopt a new plan. Article XI, Section 9(B) contains no such time requirements, and it does not provide this court with the authority to create one by ordering the commission to adopt a new plan within ten days.

{¶ 132} Likewise, the majority's reliance on Article IV, Section 2(B)(1)(f) as authority for retaining jurisdiction over these cases and controlling the work of the commission is undermined by the plain, unambiguous language of the provision. Section 2(B)(1)(f) grants this court "original jurisdiction * * * [i]n any cause on review as may be necessary to its complete determination." Article IV, Section 2(B)(1)(f), Ohio Constitution. But this court's determination of *League of Women Voters* was "complete" when it declared the General Assembly-district plan invalid. Because there was nothing left for this court to do, setting a timeline and a drop-dead date by which the commission was to act was nothing more than an exercise of raw judicial power. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 222, 93 S.Ct. 762, 35 L.Ed.2d 147 (1973) (White, J., dissenting).

### D. Article XI, Section 1 Is Not Judicially Enforceable

{¶ 133} Because petitioners' Article XI, Sections 6(A) and 6(B) arguments fail, it is necessary to address the *Bennett* petitioners' remaining objections.

{¶ 134} In objecting to the revised plan, the *Bennett* petitioners argue that the commission violated Article XI, Section 1(C) by failing to release the proposed plan to the public before adopting it, failing to allow members of the public and the commission an adequate opportunity to provide input on the proposed plan, and failing to hold three public meetings before adopting a plan. However, a violation of Section 1(C) does not provide a basis for this court to invalidate a General Assembly-district plan.

{¶ 135} Article XI, Section 9(D)(3) authorizes this court to invalidate a General Assembly-district plan only if it determines that the plan violates Article XI, Section 2, 3, 4, 5, or 7. Absent from that list is Section 1. The exclusion of a violation of Section 1 from the remedy expressly provided by Section 9(D)(3) shows that Section 1 is not judicially enforceable. *See* Scalia & Garner at 107 (the inclusion of one is the exclusion of others). As is the case with Section 6, because Article XI, Section 9(D)(3) provides no mechanism by which to enforce

compliance with Section 1(C), it is a directory requirement that is not judicially enforceable.

{¶ 136} Moreover, to accept the *Bennett* petitioners' position would mean that this court has the power to strike down a plan for a technical violation of Section 1 even if that violation had no palpable effect on the plan itself and did not violate any constitutional or federal voter-rights protections. But even the majority in *League of Women Voters* did not go to that extreme. Although it recognized that the commission had not complied with Article XI, Section 8(C)(1)(a) because it had adopted the original plan a day late, that violation was not a basis for the majority to invalidate the plan. __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 64, fn. 9.

{¶ 137} For these reasons, the *Bennett* petitioners' objection asserting that the revised General Assembly-district plan violates Article XI, Section 1(C) should be rejected.

### E. The Commission Concedes that There Are Isolated Violations of Article XI, Section 3(D)(3)

{¶ 138} The only actionable claim that the General Assembly-district plan is invalid is the *Bennett* petitioners' objection that it violates Article XI, Section 3(D)(3). That provision states that "not more than one municipal corporation or township may be split per representative district." Article XI, Section 3(D)(3), Ohio Constitution.

{¶ 139} The commission concedes that the General Assembly-district plan splits multiple municipalities in four separate districts. The only relevant evidence shows these violations to be minor and to impact only four districts. Revising the plan to keep Grove City, Jackson Township, and Copley Township intact would affect fewer than 200 residents and would not cause any of these districts to be overpopulated or underpopulated. This means that the commission can repair these defects in isolation, without affecting any other districts.

{¶ 140} Having found a technical violation in the revised plan, we turn to Article XI's remedies provision. Section 9(D)(3)(a) provides that for "isolated" violations of Section 2, 3, 4, 5, or 7, "the court shall order the commission to amend the plan to correct the violation[s]." Article XI, Section 9(D)(3)(a), Ohio Constitution. As a consequence, rather than invalidate the revised General Assembly-district plan in its entirety, we would order the commission to amend the revised plan to correct the improper division of municipalities and townships in Districts 5, 10, 31, and 33.

*F. Effects of Unmooring Review from the Plain Language of the Ohio Constitution*

{¶ 141} The parties ask this court to intervene in varying ways in the 2022 election process. The *Bennett* petitioners ask this court to stay or postpone the deadline for filing candidacy petitions and declarations of candidacy for legislative offices. The petitioners in *League of Women Voters of Ohio v. Ohio Redistricting Comm.* (Supreme Court case No. 2021-1193) ask this court to direct the legislature to adjust the election schedule. The commission requests that the court issue a decision by February 11, 2022, or, alternatively, stay the issuance of a decision until the 2022 general-election cycle is complete using the revised plan.

{¶ 142} The majority, as if existing in a vacuum, asserts that the General Assembly has the "authority to ease the pressure * * * by moving the primary election." Majority opinion at ¶ 66. But such a response belies how the 2022 Ohio election cycle got to this chaotic state; four members of the Supreme Court of Ohio brought us to this juncture—and *no one else*.

{¶ 143} Unmoored from the plain language of the Ohio Constitution, the majority has now cast uncertainty and confusion into the 2022 election cycle. By distorting and misrepresenting the plain language of Article XI, Section 9(B), the majority uses a provision that is not judicially enforceable to embolden and empower itself to strike down any redistricting map that the commission adopts. It

is now what suits the majority's fancy that determines what is an "attempt" to "primarily * * * favor or disfavor a political party," Section 6(A), and to "correspond closely to the statewide preferences of the voters of Ohio," Section 6(B). And the path of standardless judging that the majority has chosen for Ohio leads to its decision today—shifting sands rather than the rule of law, a morass surely to follow. Detached from constitutional limitations, the majority uses ad hoc rules to usurp the authority of an independent constitutional body.

{¶ 144} The guidepost of judicial modesty should be recognizing that the text of a constitutional provision is supreme. When legislative, executive, or administrative bodies ignore the text of the Constitution that sets the limitation of their powers, the judiciary stands at the ready to apply the text of the Constitution to restore balance. But when it is the judiciary that unmoors itself from the text of the Constitution, the rule of law itself is at stake.

### G. History Repeats Itself

{¶ 145} It bears repeating that four members of this court believe it reasonable to commandeer the work of the redistricting commission, and they will continue to reject any General Assembly-district plan until they get the plan they want. The majority stops just short of drawing the new map themselves or directing the commission to adopt one of the plans that has been placed in evidence only because even they recognize that that is expressly forbidden by Article XI, Section 9(C)(1) and (2). Nonetheless, one could not blame the commission for wanting to yield the map-drawing software to the majority and to let them draw the map, because that is what is happening here, albeit by way of a series of orders saying to try again.

{¶ 146} One would also think that after the *DeRolph* debacle, this court would have learned its lesson not to demand that independent constitutional bodies heed this court's ill-defined favor. In *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997) ("*DeRolph I*"), this court declared Ohio's system of public-

school funding unconstitutional. In *DeRolph I*, this court required the General Assembly to create a new public-school-funding system, but it provided no specific guidance on how to achieve a constitutional system. Three years later, after several changes by the General Assembly, this court declared that the system was still unconstitutional. *See DeRolph v. State*, 89 Ohio St.3d 1, 728 N.E.2d 993 (2000) ("*DeRolph II*"). Again, without giving any specific guidance, this court concluded that "even more is required" to create a constitutional public-school-funding system. *Id.* at 36. By the third *DeRolph* case, this court had decided that saying "not good enough" was not good enough, and it attempted to institute some parameters for the legislature to follow. *See DeRolph v. State*, 93 Ohio St.3d 309, 754 N.E.2d 1184 (2001) ("*DeRolph III*"). One parameter required the removal of wealth screens from the basic funding formula. What some justices expected to have a price tag of approximately $400 million actually would have cost the state $1.2 billion. *See* Candisky, *Keep funding fix, group says*, Columbus Dispatch (Sept. 25, 2001) 1B. On reconsideration, the court explained that it had relied on faulty information contained in a brief: "Both sides acknowledge in their memoranda in support of and opposition to the motion for reconsideration that the evidence and one of the briefs filed in *DeRolph III* contained inaccurate analysis regarding the cost of funding the base cost formula with wealth screens eliminated." *DeRolph v. State*, 93 Ohio St.3d 628, 631, 758 N.E.2d 1113 (2001).

{¶ 147} How soon the majority forgets that it relied on Dr. Rodden's plan in the first iteration of these cases, when the expert admitted that his plan was unconstitutional after this court's opinion had been published. That plan that the majority called "good enough" had predicate violations of Sections 2, 3, 4, 5, and 7 and, even then, did not meet the majority's new concept of proportionality. But the majority nonetheless bets the ranch on its reliance on its chosen experts—or at least what it cherry-picks from their evidence—even though there seems to be little proof that adopting a General Assembly-district plan in accord with its holdings in

58

*League of Women Voters* and today is remotely possible given the realities of Ohio's political geography. With only ten days to adopt a new plan, there will not be time for a *DeRolph*-type motion for reconsideration to set the majority straight.

### III. CONCLUSION

{¶ 148} The objections filed in this court are, for the most part, not well taken. The directory requirements of Article XI, Sections 1 and 6 are not judicially enforceable. Regardless, the Ohio Redistricting Commission complied with Sections 6(A) and 6(B) in adopting the revised plan, and any failure to comply with Section 1(C) was caused by this court's improper order directing the commission to adopt a new plan within ten days. The revised plan does not comply with Section 3(D)(3), but those isolated violations may be corrected by directing the commission to amend the revised plan without affecting its overall validity. For these reasons, we dissent from the majority's decision to invalidate the revised plan.

———————————

**FISCHER, J., dissenting.**

{¶ 149} I must respectfully dissent. Like the previous majority opinion in these cases, this second majority opinion does not follow the text of the Ohio Constitution. As stated in my previous dissent, I would not reach the merits of the cases. The majority opinion again attempts to exercise authority not granted to this court by the state Constitution. *See League of Women Voters of Ohio v. Ohio Redistricting Comm.*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, ¶ 279 (Fischer, J., dissenting).

{¶ 150} Because, pursuant to Article XI, Section 8(C)(1)(a) of the Ohio Constitution, at least two commission members representing each of the two largest political parties did not vote for the General Assembly–district plan currently before this court, we are once again faced with a four-year plan, which, as petitioners have repeatedly conceded, *see id.* at ¶ 280 (Fischer, J., dissenting), is subject to the impasse provisions of Article XI, Section 8. By not following the wording of the

Ohio Constitution in Article XI, Section 8(C)(1)(a), the majority opinion impinges upon the citizens' right to vote in two General Assembly elections according to the terms of Article XI.

{¶ 151} Article XI, Section 8 sets forth a precise constitutional roadmap for how this state shall proceed in redistricting Ohio House and Ohio Senate districts when the Ohio Redistricting Commission sets forth a four-year plan. By not following these constitutionally required "directions," the first majority opinion in these cases led this state the wrong way down a one-way street, undermining and subverting the purpose of the constitutional roadmap. Today, instead of turning around and heading back in the proper constitutional direction imposed by 71 percent of Ohio's voters in 2015, the majority opinion doubles down and continues driving the state unconstitutionally in the wrong direction, toward a brick wall comprising both a panoply of election-related deadlines and a potential constitutional crisis.

{¶ 152} The parties all acknowledge that Article XI, Section 8 applies because the redistricting commission has adopted a four-year plan upon an impasse. The applicable provision, Section 8(C)(1)(a), makes clear that Section 9 does not apply. In fact, Section 9 is not mentioned in that provision, unlike in the provision addressing a ten-year plan, Section 8(B), or in the provision addressing a six-year plan, Section 8(C)(1)(b):

> (B) If the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state and shall remain effective until the next year ending in the numeral one, *except as provided in Section 9* of this article.

(C)(1)(a) Except as otherwise provided in division (C)(1)(b) of this section, if the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B)(3) of Section 1 of this article, the plan shall take effect upon filing with the secretary of state *and shall remain effective until two general elections for the house of representatives have occurred under the plan.*

(b) If the commission adopts a final general assembly district plan in accordance with division (A)(3) of this section by a simple majority vote of the commission, and not by the vote required to adopt a plan under division (B) of Section 1 of this article, and that plan is adopted to replace a plan that ceased to be effective under division (C)(1)(a) of this section before a year ending in the numeral one, the plan adopted under this division shall take effect upon filing with the secretary of state and shall remain effective until a year ending in the numeral one, *except as provided in Section 9* of this article.

(Emphasis added.) Ohio Constitution, Article XI, Section 8. A four-year plan does not constitutionally come before this court, because there are no Section 9 exceptions in the Constitution's text in Section 8(C)(1)(a), as Article XI was designed to keep this court out of a four-year-plan dispute. By adjudicating this dispute without the state Constitution's calling upon this court to do so, the two majority opinions have created the exact issues and problems that this court now faces in these cases upon their return.

{¶ 153} In doing so, the majority opinion is seemingly more interested in making policy than enforcing the Constitution's text as written. The majority

opinion outlines a policy preference for a specific type of plan/map that the Constitution does not require. Under this state's Constitution, specifically Article XI, that policy choice must be made by the Ohio Redistricting Commission (a constitutionally created entity), not this court (a separately created constitutional institution).

{¶ 154} While I still conclude that we do not have the constitutional authority to review this four-year plan, *see League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, ¶ 280-301 (Fischer, J., dissenting), because the majority opinion does review the plan, I am forced to respond, to an extent, on the merits, as I was forced to do in *State v. Gonzales*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, ¶ 24, 29 (Fischer, J., concurring in part and dissenting in part), and *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 51 (Fischer, J., concurring in part and dissenting in part).

{¶ 155} Notably, Article XI, Section 6(B) of the Ohio Constitution uses the term "favor"—not "substantially favor," "significantly favor," or "assuredly favor." The Constitution does not set forth when a plan crosses the threshold to having been drawn "primarily to favor" a political party. *See* Ohio Constitution, Article XI, Section 6(A). The majority opinion evinces a desire to create a requirement—one not found anywhere in Article XI—that a political party be guaranteed to have (or that a political party not be guaranteed to have) a certain number of seats in the Ohio House and Ohio Senate. Not only does the majority opinion seek to create a requirement regarding the number of seats, it also implies a requirement that the plan meet certain percentage thresholds, which are also not found in Article XI. The Ohio Supreme Court should not, and lacks any constitutional authority to, determine winners and losers of elections, but this majority opinion creates that authority without supporting constitutional text. In finding the two four-year plans adopted by the commission unconstitutional for the reasons set forth in the majority opinions, this court is attempting to do just that—

determine winners and losers of elections—which, again, it is not permitted to do. By effectively ordering the commission to adopt a plan meeting very specific criteria *not* set forth in the Ohio Constitution, the majority opinion is effectively and unconstitutionally usurping authority over creating a plan. In doing so, the majority opinion once again breaches the separation-of-powers principles inherent in the Ohio Constitution. *See League of Women Voters of Ohio* at ¶ 339 (Fischer, J., dissenting).

{¶ 156} As explained in the first dissenting opinion herein, in disregarding the separation-of-powers principles, the majority opinion sets up another de facto *DeRolph* situation. Dissenting opinion of Kennedy and DeWine, JJ., ¶ 146, citing *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997); *DeRolph v. State*, 89 Ohio St.3d 1, 728 N.E.2d 993 (2000); and *DeRolph v. State*, 93 Ohio St.3d 309, 754 N.E.2d 1184 (2001). By reaching beyond this court's authority in declaring the two redistricting plans unconstitutional, the majority opinion creates a constitutional crisis within the state government. The unconstitutional approach of the majority opinion continues to undermine this court's independence, impartiality, and reputation for integrity.

{¶ 157} The bottom line is obvious. If the majority opinion had followed the specific wording of Article XI, Section 8, which logically follows from the rest of the text of Article XI, this court would: (1) be abiding by and respecting the constitutional requirements and structure of Article XI, (2) not be interfering in Ohioans' voting rights, (3) not be creating unauthorized deadlines for the Ohio Redistricting Commission, and (4) not be forcing the General Assembly to alter candidate nominating laws. Moreover, this dispute would be dealt with after two more General Assembly elections—as set forth in Article XI, Section 8(C)(1)(a)'s requirement that four-year plans "*shall remain effective until two general elections for the house of representatives have occurred under the plan*." (Emphasis added.)

{¶ 158} Moreover, as noted in my previous dissenting opinion in these cases, *League of Women Voters of Ohio*, __ Ohio St.3d __, 2022-Ohio-65, __ N.E.3d __, at ¶ 340, and as acknowledged in the majority opinion, majority opinion at ¶ 29, the standard of proof in these cases is beyond a reasonable doubt.

{¶ 159} Petitioners have not reached that high standard as a matter of fact or of law. The first dissenting opinion contains a detailed analysis supporting the conclusions that the plan currently before us was not drawn primarily to favor or disfavor a political party under Article XI, Section 6(A) and that the commission attempted to comply with Article XI, Section 6(B). This reasoned analysis raises more than a reasonable doubt as to whether, under the facts currently before us, the commission failed to comply with Article XI, Section 6. Thus, the facts before us show a highly and closely contested case in which neither side has carried the day. Petitioners, who have the heavy burden, could not carry a clear-and-convincing burden nor meet a preponderance standard and thus can never reach and carry a beyond-a-reasonable-doubt burden. Because petitioners have not satisfied the undisputed burden of proof in these cases of beyond a reasonable doubt, this court cannot invalidate the plan on this basis, although it purports to do so.

{¶ 160} As detailed in the first dissenting opinion, the evidence submitted shows only a few technical problems that are within this court's authority to address, assuming this court has any authority at all at this time in these cases. Those technical flaws could easily be corrected by the commission (and, notably, by February 11, 2022, the date on which respondents assert that House and Senate districts must be finalized in order for the election process to proceed on schedule). By moving beyond those limited technical problems and invalidating the entire plan, in an unconstitutional attempt to impose its policy decisions upon the Ohio Redistricting Commission, the majority opinion directly impinges upon Ohioans' right to vote.

**{¶ 161}** The majority opinion forces its policy viewpoints on a constitutional institution created by 71 percent of the voters of Ohio, violates the separation-of-powers principles inherent in the Ohio Constitution, and violates long-standing Ohio Supreme Court case law that proof of a constitutional violation in this situation must be shown beyond a reasonable doubt; therefore, it undermines this court's independence, impartiality, and integrity. For these reasons, I must respectfully dissent.

_____

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, Alora Thomas, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, Joshua González, Juliana Goldrosen, David Denuyl, L. Brady Bender, Alex Thomson, Anupam Sharma, and Yale Fu, for petitioners in case No. 2021-1193.

McTigue, Colombo & Clinger, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Jyoti Jasrasaria, and Spencer W. Klein, for petitioners in case No. 2021-1198.

Reed Smith, L.L.P., Peter M. Ellis, M. Patrick Yingling, Brian A. Sutherland, Ben R. Fliegel, Brad A. Funari, and Danielle L. Stewart; and Brennan Center for Justice at New York University School of Law, Alicia L. Bannon, Yurij Rudensky, Michael Li, Harry Black, and Ethan Herenstein, for petitioners in case No. 2021-1210.

Dave Yost, Attorney General, and Organ Law, L.L.P., Erik J. Clark, and Ashley Merino, special counsel to Attorney General Dave Yost, for respondent Ohio Redistricting Commission.

Senator Vernon Sykes and House Minority Leader Allison Russo, pro se.

_____